# GRAND ISLE COUNTY.

## January Term, 1843.

Present Hon. CHARLES K. WILLIAMS, *Chief Justice.*
   "        ISAAC F. REDFIELD,  } *Assistant Justices.*
   "        MILO L. BENNETT,    }

---

### De Clancy Stoughton, Jr., *v.* Danford Mott.

Under the act of Congress of 1838, commonly called the neutrality act, the collectors and other officers therein mentioned, were authorized to seize and detain vessels having arms, &c. on board, passing towards a foreign state or colony, conterminous with the United States, when they had reason to believe that the vessels, &c. were to be employed in a military expedition or operation against such state or colony.

The term "*frontier,*" means something more than the boundary line. It means a tract of country contiguous to the line; and it is not material whether such vessels, &c. were actually intended to be passed across the boundary line into the foreign territory.

When a plaintiff, in his replication, traverses an immaterial fact, which is found in his favor, the defendant cannot have judgment, *veridicto non obstante.*

This was an action of trespass, in two counts, for seizing and conveying away, at Champlain, in the state of New York, on the 10th of November, 1838, a sloop, called the Gen. McComb, and also for seizing, taking, and carrying away, on the 12th of said November, certain arms and munitions of war, found on board of the same.

The defendant pleaded the general issue; and also three pleas in bar of the action.

The first plea in bar, was, in substance—that, at the time of the alleged seizure, the defendant was a deputy collector of the customs, for the district of Vermont; that, on the 8th of said November, said sloop arrived at Rouse's Point, in said Champlain, near the northern boundary of the United States, from some place south of the same, having on board, large quantities of arms and munitions of war, and was about to pass the frontier of the United States, for some place within

the province of Lower Canada; that, from the character of

the vessel, and the quantity of arms and munitions of war, there was probable cause to believe, and the defendant did believe, that said sloop and arms, and munitions of war, were intended to be employed by the owner or owners thereof, in carrying on a military expedition against the province of Low-Canada, a province of the kingdom of Great Britain, with whom the United States were at peace; and that, for the reasons aforesaid, the defendant seized said sloop, and said arms and munitions, and detained the same for the decision of the President of the United States, as by the laws of the United States he was commanded to do; which is the same taking complained of.

Second plea in bar, the same as the first, except that Thomas Crook is stated to have been a deputy collector in the northern district of New York, and that the taking was by his order.

Third plea in bar, the same, except that it is stated that Justin Dimmick was a captain in the United States army, commanding certain troops of the United States, at said Rouse's Point, and that the taking was by his order.

Replication to the pleas in bar, that the sloop was not, at the time of said seizure, about to pass the frontier of the United States, as in said pleas alleged. Issue to the country.

On the trial in the county county court it appeared by the evidence on the part of the plaintiff, that the said arms and munitions of war were collected at a place called Alburgh Springs, and put on board the said sloop on the night of the 6th November, 1838; that on the seventh of the same November, the said sloop, with the said arms and munitions of war on board, was sailed from Alburgh Springs to said Rouse's Point, the said Point being about one mile south of the said boundary and the most northern landing place in the United States;—that on the said 7th of November, a battle was fought between a portion of the British troops, and a party commonly called the patriots, in the province of Canada adjoining, and near to said Rouse's Point, and that, while the said battle was raging and about the time of its conclusion, by the defeat and flight of the patriots, the said sloop rounded to, at said Rouse's Point and cast anchor in the stream about fifty rods from the wharf at said landing place. The

plaintiff's evidence tended also to show that the said sloop was chartered to go from said Alburgh Springs to said Rouse's Point and *no further* to the north ; but the same evidence also tended to show that the said arms and munitions of war were intended to be used in the said patriot service in the said province of Canada, and to be transhipped from said sloop to small boats, and by them conveyed to some place within the said province.

It appeared by evidence on the part of the defendant, that he was a deputy collector and inspector, under the collector of the customs for Vermont district ; that one Thomas Crook was, in like manner, a deputy collector and inspector, under the collector of the customs for the northern district of New York, and that Justin Dimmick, captain of artillery in the United States army, was then stationed, and had command of the United States troops then stationed, at said Rouse's Point.

Evidence on the part of the defendant was, also, introduced, tending to show, that, after the said sloop had rounded to at Rouse's Point and cast anchor, the said Capt. Dimmick requested the defendant and said Crook to go on board the said sloop and make due examination as to the loading, and that for that purpose, the defendant took his boat, and hands, and conducted the said Crook, with a sergeant's guard, on board the said sloop, and that, after making the examination, and ascertaining that the said sloop was loaded with fixed ammunition, powder, balls, &c., and finding no one on board, Crook left the guard on board and returned with the defendant to the shore, and made report of the loading to Capt. Dimmick ; and that, thereupon, Dimmick requested the defendant and Crook to seize the said sloop and bring her to the shore ; that the defendant declined making the seizure, as it was in Crook's district, and was, therefore, more appropriately his duty ; and that, thereupon, Dimmick requested Crook to make the seizure, and that Crook did seize said sloop and convey it to the shore, when Dimmick took control of the arms and munitions, and caused them to be taken out of the sloop and secured, in obedience to the act of Congress of the 10th March, 1838.

Evidence was introduced on the part of the plaintiff, tending to prove that the defendant was, voluntarily, aiding and

assisting, both in the first examination of the sloop, and in the actual seizure and detention of the same, and tending to prove his subsequent repeated admission that he seized the sloop. It appeared that, in consequence of her being improperly moored at the wharf, the sloop broke loose, in a high wind, during the first night after the seizure, and went ashore, where she had remained a wreck, up to the time of the trial. It also appeared that the sloop was brought to the wharf within two or three hours after she was boarded and the guard left on board as aforesaid. It did not appear that the defendant or Crook was on board when the vessel was brought to the wharf; but she appeared to have been brought there under the immediate direction of one Philips who went on board after the defendant and Crook had returned to the shore as aforesaid.

On the subject of the taking, the defendant's counsel insisted that the act of boarding the sloop, for the purpose of ascertaining the character of the loading, was not a taking of the vessel, for which the action of trespass would lie. And to this the court assented, and instructed the jury accordingly. The defendant's counsel further insisted that if the manner of boarding in this instance, as by posting and leaving a military guard on board, did amount to a taking of the vessel, yet, for that taking, the defendant was not responsible, unless he united or participated in the order of Crook or Dimmick for such taking of possession. On this point the court charged substantially as follows: That if the defendant, knowing it was intended to take possession of the sloop, if she was found to have munitions of war on board, voluntarily assisted with his boat and hands to carry that purpose into effect, he was, in legal contemplation, a party and principal in the trespass. To which direction the defendant excepted.

Under the issue upon the pleas in bar, the defendant insisted that the arms and munitions of war were liable to seizure and detention by the law of Congress of the 10th of March, 1838, commonly called the neutrality law, independent of the question, whether the sloop was about to pass the frontier, or not; and that, in relation to the sloop, the term *frontier*, in the said act of Congress, was not limited to, and did not mean, an imaginary line, without breadth, dividing the

GRAND ISLE, United States from said province of Canada, but was intend-
January, ed to embrace a belt of country contiguous to, and bounded
1843. on the north by said line. But the court decided, and so
Stoughton charged the jury, that the term *frontier*, in the said act, was
v. the dividing line between the two countries, and that the
Mott. defendant had not authority, under the said act, to seize
and detain the said sloop, without evidence, satisfying the
jury, that the said sloop was to be conveyed beyond the said
line, and into the said province of Canada; that the circum-
stances of the loading on board, the use to be made of it,
and the apparent direction of the sloop, were matters to be
weighed in connexion with the evidence relating to the al-
leged contract of the parties limiting the voyage; and that,
unless the jury were satisfied that, in point of fact, it was the
intention of the parties that the sloop should pass the line, it
did not amount to a passing the frontier of the United States,
as contemplated in the said act, and did not, on the defend-
ant's part, sustain the issue on trial under the special pleas.

The court further instructed the jury that, inasmuch as
the defendant had not, in pleading, claimed a temporary
right of detaining the vessel, as incident to that of seizing
and taking away the munitions of war found on board, no
such temporary right was properly in issue, or to be regard-
ed by them.

Verdict and judgment for the plaintiff. To the decision
and charge of the court under the issue upon the pleas in
bar, the defendant excepted.

*C. Adams,* for defendant.

I. The court erred, in charging that the term frontier
meant the dividing line between the two countries. It does
not mean a line without breadth, dividing countries, but a
belt of country bounded by that line. In Webster's diction-
ary, it is defined to be *the border, confine, extreme part* of a
country. It is a word of frequent occurrence in the laws
of the United States, and is never used as the dividing line,
but is always used as designating the country bordering on
the line. 4 U. S. Laws 2255, 2272, 2348, 2460.

II. The court also erred, in directing the jury that the de-
cision of the question of passing the frontier, rested on the
proof of the intention of the party. The court decided

" that, unless the jury were satisfied that, in point of fact, it ' was the intention of the parties that the sloop should pass ' the line, it did not amount to a passing of the frontier of ' the United States, as contemplated in the said act." Under that charge, if the sloop had been taken across the line, it would not have justified the defendant, without proof, that it was taken in conformity to such intention. So when abandoned by the parties, if, instead of being anchored it had drifted over, or if the patriots had come over and taken it, it would not have come within the charge.

The intention of the party, was not a traversable fact. It is not one of the conditions on which the right of seizure rests. The character of the articles seized, and of the officer seizing, being admitted, there were but two issues that could be raised, namely, that the articles were in motion on the frontier, and probable cause of belief. The act must have this latitude of construction, or Congress have signally failed to carry out their own intention. Congress intended to prohibit the transportation of all arms and munitions into Canada, and the officers of government were required to detain, where circumstances indicated such intention.

*F. Hazen* and *O. Stevens*, for plaintiff.

The opinion of the court was delivered by

WILLIAMS, Ch. J.—This was an action of trespass against the defendant, for seizing, taking, and conveying away, a certain sloop called the Gen. McComb, and, also, certain arms and munitions of war. To the declaration the defendant plead the general issue, and a plea in bar, and the plea in bar is traversed. On the trial by the jury, a verdict passed for the plaintiff, and the defendant moved for a judgment, *veridicto non obstante*, which was overruled by the court. The defendant endeavored to justify the seizing and detaining the vessel, &c., under an act of Congress, passed in 1838, commonly called the neutrality act, which provided for the seizing of vessels and arms, prepared for expeditions against conterminous territory of foreign nations, with whom the United States were at peace.

On the subject of the taking, the defendant's counsel requested the court to instruct the jury, that the act

Grand Isle,
January,
1843.

Stoughton
v.
Mott.

of boarding the sloop, for the purpose of ascertaining the character of the loading, was not a taking of the vessel, for which the action of trespass would lie. To this the court assented, and charged the jury accordingly. They further requested the court to charge, that if the manner of boarding, &c., did amount to a taking of the vessel, yet the defendant was not responsible, unless he united or participated in the order of Crook or Dimmick, for such taking. The charge of the court was, in substance, that if the defendant knew of the intention of taking the vessel, and voluntarily assisted with his boat, he was, in contemplation of law, a party and principal in the trespass. The charge was undoubtedly correct, in this particular, as it was evidently such an invasion of the property of the plaintiff, as would amount to a trespass, and for which, unless justified, the defendant was liable. Indeed, it may be questioned whether the court did not go too far, in acceding to the first request of the defendant, if there had been no other plea but the general issue.

The plea in bar sets forth, in substance, that the defendant was a deputy collector ; that the sloop, Gen. McComb, arrived at Rouse's Point, near the northern boundary of the United States, from some place to the south, and was then and there about to pass the frontier, for some place within the province of Lower Canada, having on board arms and munitions of war ; and that, from the character of the vessel, and the arms and munitions of war on board, there was probable cause to believe, and the defendant did believe, they were intended to be employed in military operations in the province of Canada, &c., and for the reasons aforesaid, the defendant, as such deputy collector, did seize and detain the said sloop, and the said arms, &c. In the replication, the plaintiff denies that the sloop was about to pass the frontier of the United States, and issue is taken upon that fact only.

On the trial, the question arose as to what should be considered the frontier. The court decided that the frontier was the boundary line, between the United States and the province of Canada ; and unless the evidence satisfied the jury that the sloop was to be conveyed beyond the line, and into the province of Canada, the defendant had no authority, under the act before mentioned, to seize and detain the ves-

sel.  We think the court were incorrect in both of these decisions, as to the construction of the act of Congress, before mentioned.  The term frontier, embraces a tract of country of a greater or less width, bordering on, and contiguous to, the line ; and, though both the act of Congress, and the plea, speak of the vessel, as about to pass the frontier for a place within a foreign state or colony, yet, we do not consider it necessary, in order to justify the officers therein mentioned, in seizing and detaining a vessel, &c., that the vessel should actually be about to pass the boundary line.  Indeed, such a construction would render the act wholly insufficient and inoperative.  It cannot be that a vessel, with arms and munitions, might approach the extreme verge of the frontier, close to the line, where, as the evidence tends to prove, all the arms, ammunition and munitions of war, could be taken therefrom, and used with the consent of the owner, in forwarding, and carrying on, military operations within the territory of a foreign power, with whom the United States were at peace, and no officer of the United States be justified in interfering.  We think the officers mentioned in the act of Congress, were authorized and justified by that act, in seizing and detaining any vessel, having on board arms or munitions of war, sailing in the frontier, and near to the boundary line, and in a direction to the foreign province, if they had *probable cause to believe, and did believe,* either from the character of the vessel, or the quantity of arms and munitions, on board, or other circumstances, that either the vessel or the munitions of war, were intended to be employed, either by the owner thereof, or any other person with his privity, in carrying on any military expedition or operations, within the territory of a foreign power.  As the decision of the court made the justification of the defendant to depend wholly on the fact, whether the vessel was about to  pass the boundary line of the United States, into the province of Canada, the decision was erroneous and must be reversed.

It follows from the opinion already expressed, that the plaintiff, in his replication, traversed an immaterial allegation in the defendant's plea ; leaving the material part unanswered.  The defendant now insists, that he is entitled to a judgment, notwithstanding the verdict.  Such a judgment is never rendered for a defendant.  It is only rendered for a plaintiff,

GRAND ISLE,<br>*January,*<br>1843.<br><br>Stoughton<br>*v.*<br>Mott.

GRAND ISLE, upon the confession in a plea, bad in substance.    When a
January, defendant passes over a replication, insufficient and immate-
1843. rial in law, without demurrer, and an issue of fact has been
Brown joined on such immaterial replication, and found against him,
v. the court, not knowing from the finding of the jury, for
Wadsworth whom to give judgment, will either award a repleader, or
& White. arrest the judgment, on a proper motion therefor, as a useless
trial might have been prevented if the plaintiff, instead of
joining issue, had demurred to the traverse.    No motion,
either in arrest or for a repleader, has been made.    But as
the judgment of the county court is reversed, and the cause
will have to be remanded there for trial of the general issue,
the counsel can there make such application to alter or
amend the pleadings as they may think the interest of their
clients require.

The judgment of the county court is reversed.